## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Adam J. Sedia
Rubino, Ruman, Crosmer & Polen
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Guardianship of A.M. | March 30, 2015 |
| | Court of Appeals Case No. 46A03-1409-GU-328 |
| Shapree Bailey, | |
| *Appellants-Respondent,* | Appeal from the LaPorte Superior Court |
| v. | The Honorable Richard R. Stalbrink, Jr., Judge |
| | Case No. 46D02-1405-GU-45 |
| Blanche Meriweather and Douglas Meriweather, | |
| *Appellees-Petitioners.* | |

**Bradford, Judge.**

## Case Summary

A.M. was born in February of 2009 to Appellant-Respondent Shapree Bailey ("Mother") and Douglas Meriweather II ("Father")[1]; the trio resided for a time in Michigan City. In 2010 or 2011, A.M. moved with Mother and Father to St. Louis, Missouri. Even after moving with Mother and Father to St. Louis, A.M. spent most of his time with Father's parents in Michigan City, Appellees-Petitioners Blanche and Douglas Meriweather ("Grandmother" and "Grandfather" respectively, collectively, "Grandparents"). At some point, Father was incarcerated in the federal prison system and currently is on parole and living in Mississippi.

In August of 2013, Mother sent A.M. to live with Grandparents following a violent altercation with her boyfriend. After August of 2013, Mother never visited or telephoned A.M. and texted Grandmother "a couple times" to tell A.M. goodnight for her. On May 14, 2014, Grandparents filed a petition to be appointed A.M.'s permanent guardians. Following a hearing on August 11, 2014, the juvenile court granted Grandparents' petition to be appointed A.M.'s guardians. Mother now appeals, arguing that the juvenile court applied the wrong standard in evaluating Grandparents' petition and, even if it had applied the proper standard, its findings do not support its conclusions. We affirm.

## Facts and Procedural History

---

[1] Father does not participate in this appeal.

[3]     A.M. was born on February 3, 2009, to Mother and Father. At the time, the trio resided in Michigan City, where Grandparents, who are Father's parents, had also resided for over twenty years. In 2010 or 2011, Mother, Father, and A.M. relocated to St. Louis. Despite the relocation, A.M. has lived with Grandparents "most of his life[,]" with A.M. spending all of his birthdays and Christmases with Grandparents. Tr. p. 12. At some point, Father was incarcerated in the federal prison system and is currently on parole, residing in Tupelo, Mississippi.

[4]     In August of 2013, A.M. came to live with Grandparents following a violent confrontation between Mother and her then-boyfriend which A.M. witnessed, during which the boyfriend pulled a firearm on Mother and Mother brandished a knife. On May 14, 2014, Grandparents filed a petition to be appointed permanent guardians of A.M. On June 27, the juvenile court held a preliminary hearing on the guardianship petition. Between August of 2013 and June 27, 2014, Mother had not visited or contacted A.M., merely texting Grandmother "a couple of times to tell [her] to tell [A.M.] good night." Tr. p. 42. The juvenile court placed A.M. with Grandparents pending the guardianship final hearing, allowing for visitation with Mother. Between June 27, 2014, and August 1, 2014, Mother had no contact with A.M. On August 1, 2014, Mother exercised visitation and retrieved A.M. from Grandparents' residence. A.M. had to be physically forced into the car in which Mother arrived while crying, screaming, and kicking.

On August 11, 2014, the juvenile court held a final hearing on Grandparents' guardianship petition. Mother testified that she had had four residences since moving to St. Louis. Grandparents introduced evidence that Mother had been arrested in 2010 for being an accessory to shoplifting and in 2011 for domestic battery and was the subject of an open arrest warrant out of Missouri for a domestic battery incident that took place on June 15, 2014. Mother testified that she worked approximately thirty hours per week as a laundry aide, making $8.50 per hour, but that "they're slowing down" and she "didn't get paid this last couple months." Tr. pp. 62-63.

Grandparents also introduced into evidence photographs and captions posted from an email account named "blu3_dream23." Tr. p. 67. Among the pictures were photographs of her other son and a hand holding what appears to be a hand-rolled cigarette, with the caption "4grams in my backwood [cigar.]" Petitioner's Ex. B. Mother denied that the email account was hers, and, while she admitted that it was her hand in the photograph with the hand-rolled cigarette, she claimed that she was holding a "[f]lavored cigar" and denied that it was a "blunt[.]" Tr. p. 68.

Following the hearing, the juvenile court issued an order on August 19, 2014, appointing Grandparents permanent guardians of A.M. The order provides, in part, as follows:

> 7. [Grandparents] have demonstrated a history of stability in their lifestyle. [Grandfather] has been employed with the same employer for approximately twenty-nine years. [Grandmother]

was a long term employee with the Michigan City School Corporation's kindergarten and pre-school programs. [Grandparents] have been married for twenty-five years, and they have resided in the same home for the past twenty-three years.

8. [Grandparents'] residence is adequate in size and space to meet the needs of [A.M.]

9. [Grandparents] are not presently serving as guardians to any non-party to these proceedings.

10. Neither of the [Grandparents] has ever been arrested nor convicted of a crime.

11. [A.M.] has been in the custody of [Grandparents] for the majority of his life and has been in the [Grandparents]' custody without interruption since August, 2013.

12. The circumstances behind [Grandparents]' assuming custody of [A.M.] has occurred at the request of [Mother] during periods of stress and/or strife in her life.

13. While in the care of [Grandparents, A.M.] has learned to read, developed some rudimentary math skills, can write his name and simple sentences, and can recite the alphabet.

14. [Grandparents] have tentatively enrolled [A.M.] in a kindergarten program at the St. Paul Lutheran Church for the 2014-2015 academic year.

15. While in [Grandparents]' custody, all of [A.M.]'s medical needs and immunizations have been met.

16. Mother has lived … at approximately six different addresses in the last five years, both here and in Missouri.

17. Prior to moving to Missouri, [Mother] was arrested for Theft … and Domestic Battery …, with both matters being dismissed vis-à-vis a Pre-Trial Diversion disposition on July 19, 2013.

18. There presently is a Warrant for the arrest of [Mother] as issued by a St. Louis, Missouri court on or about August 1, 2014, for the misdemeanor offense of Assault 3rd Degree and a bond

amount of $1,000.00 and [Mother]'s failure to appear at said hearing.

19. Since residing in the St. Louis, Missouri area, [Mother] identified at least four different locations where she has resided, although she did not include the address that is identified on the aforementioned arrest warrant as a prior residence.

20. Mother indicated that her present address is a two-bedroom apartment and that her sons would share one of the bedrooms.

21. Since residing in the St. Louis, Missouri area, [Mother] has contacted [Grandparents] and requested their assistance in caring for [A.M.] on at least two occasions prior to August, 2013. On each occasion, [Grandparents] traveled to [Mother]'s residence in the St. Louis, Missouri area to retrieve [A.M.]

22. Mother has been employed for the past year doing laundry work and presently earns $8.50 per hour working thirty hours per week.

23. Mother is uncertain about her continued employment.

24. Mother filed 2013 federal income tax returns wherein she claimed [A.M.] as a dependent despite [A.M.] having residing with [Grandparents] for the final five months of the 2013 calendar year as well as earlier in the same year.

25. In May, 2014 [Mother] applied for benefits and governmental aid for her family from the State of Missouri and included [A.M.] who is the subject of this proceeding as a resident within her home.

26. Mother received governmental benefits for herself and family during the months of June, 2014 and July, 2014. Mother's benefit amount was calculated on the basis of [A.M.] residing in her home, despite her knowledge that [A.M.] was in the custody of [Grandparents].

27. As a result of this apparent misrepresentation by [Mother], the St. Louis County Division of Public Assistance is reviewing [Mother]'s application for any fraudulent representations.

28.     When confronted with copies of online photos and posts, Mother admitted that the photos were of her and she blamed all of the posts on her lost cell phone and her facebook page being hacked and utilized by someone else.

29.     [Mother] acknowledged [A.M.]'s observation of her behavior in the photographs is inappropriate.

30.     Since [A.M.]'s placement with [Grandparents] in August, 2013, Mother has only initiated a couple of contacts with [A.M.] herein.

31.     Since [A.M.]'s placement with [Grandparents], [Mother] failed to initiate any contact with [A.M.] during the holiday season of 2013-2014, including but not limited to the Christmas holiday or [A.M.]'s birthday in February, 2014 either by way of a telephone call, birthday card or birthday present.

32.     The first contact [Mother] had with [Grandparents] to express any concern and interest in [A.M.] occurred only after [Grandparents] commenced with this cause.

33.     A hearing on Temporary Guardianship was held on June 27, 2014 and the evidence entered at said hearing is hereby incorporated herein for the purposes of the Permanent Guardianship.

34.     Immediately following the court hearing on June 27, 2014, [Grandparents] and [Mother] agreed to permit [Mother] and the maternal great-grandmother to visit with [A.M.] at [Grandparents]' residence.

35.     During said face-to-face visit, [Mother] received a telephone call from an unknown third party, left the residence to take said call, and did not seek to resume the visit following the conclusion of said call and that the total amount of time that [Mother] spent with [A.M.] during this visit was approximately five minutes.

36.     In response to this court's order of July 22, 2014, [Mother] did exercise parenting time with [A.M.] from August 1-August 11, 2014.

37. During the exchange of [A.M.] between [Grandparents] with [Mother] and two associates, [A.M.] was crying hysterically and had to be physically restrained by the three female adults and forced into their automobile, still screaming, kicking and crying, unrestrained, while [Mother] drove from [Grandparents]' residence.

38. Prior to [Mother] exercising Parenting Time with [A.M.] commencing on August I, 2014, [Mother] did not have any contact with [A.M.], telephonic or otherwise after leaving [Grandparents]' residence on June 27, 2014.

39. This court notes that [Mother] did not arrive for the court hearing scheduled for 9:00 a.m. on August 11, 2014 until approximately 9:35 a.m.

40. There exists a meaningful and closely bonded relationship between [Grandparents] and [A.M.] as contained within Ind. Code 29-3-5-4.

41. It is in the best interests of [A.M.] to have [Grandparents] appointed as his Permanent Guardians.

CONCLUSIONS OF LAW

1. This court is vested with discretion in making determinations as to the guardianship of a minor child. *See* Ind. Code 29-3-2-4; Conrad v. Atkins (in Re: Atkins'), 868 N.E.2d 878, at 883 (Ind. Ct. App. 2007).

2. The [Grandparents] are qualified persons who are suitable and willing to serve as [A.M.]'s guardians. Ind. Code 29-3-5-3(a).

3. The [Grandparents] are biologically related to [A.M.] and have kept him in their care, custody and supervision for more than six months prior to the filing of the petition. Ind. Code 29-3-5-5(a)(5).

4. The natural father of [A.M.] is not seeking custody of [A.M.] nor has he filed an objection to the appointment of [Grandparents] as Permanent Guardians for [A.M.].

5.     It is permissible as part of the determination of [A.M.]'s best interests for the court to consider the status and well-being of [A.M.] while in the physical custody of the [Grandparents]. *See* Trost-Steffen v. Steffen. 772 N.E.2d 500 (Ind. Ct. App. 2002), *reh'g denied*.

6.     This court is required to appoint, as guardian of a minor, a person who is most suitable and willing to serve, having due regard to, in pertinent part, the relationship of the proposed guardian to [A.M.].  Ind. Code 29-3-5-4.

7.     A guardianship proceeding is akin to a child custody proceeding, which requires the court to consider the child custody statutes and case law, in addition to the guardianship statutes when making its determination.  *See generally*, In Re the Guardianship of L.L., 745 N.E.2d 222, (Ind. Ct. App. 2001), and Jenkins v. Godbey, 796 N.E.2d 756 (Ind. Ct. App. 2003).

8.     Pursuant to I.C. 31-17-2-8 this court finds that the factors set forth within said statute are applicable to the facts as established herein, and that it is in the best interests of [A.M.] that [Grandparents] be appointed as the permanent guardians of [A.M.] until further order of the court.

9.     Until further order of the court, [Mother] shall have parenting time with [A.M.] pursuant to the Indiana Parenting Time Guidelines where distance is a factor; however, said parenting time shall be confined to LaPorte County until such time as [Mother] has successfully resolved all pending criminal matters in St. Louis, Missouri.

[8]     Appellant's App. pp. 5-9.  Mother contends on appeal the juvenile court abused its discretion by applying the wrong standard to this case and that, even if it had applied the correct standard, the evidence does not support its judgment.

# Discussion and Decision

At the outset, we note that Grandparents have not filed an Appellees' brief. In such cases, we do not need to develop an argument for Grandparents, and we apply a less stringent standard of review. *Fowler v. Perry*, 830 N.E.2d 97, 102 (Ind. Ct. App. 2005). We may reverse the juvenile court if Mother is able to establish prima facie error, which is error at first sight, on first appearance, or on the face of it. *Id.*

## Standard of Review

All findings and orders of the trial court in guardianship proceedings are within the trial court's discretion. Ind. Code § 29-3-2-4. Thus, we will review those findings under an abuse of discretion standard. *E.N. ex rel. Nesbitt v. Rising Sun-Ohio County Community School Corp.*, 720 N.E.2d 447, 450 (Ind. Ct. App. 1999), *reh'g denied, trans. denied.* In determining whether the trial court abused its discretion, we look to the trial court's findings of fact and conclusions thereon. We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard,* 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999).

*In re Guardianship of J.K.*, 862 N.E.2d 686, 690-91 (Ind. Ct. App. 2007).

[11]   Indiana Code section 29-3-5-3 provides, in part, as follows:

> (a) Except under subsection (c), if it is alleged and the court finds that:
>
> (1) the individual for whom the guardian is sought is an incapacitated person or a minor; and
>
> (2) the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the incapacitated person or minor;
>
> the court shall appoint a guardian under this chapter.

[12]   The Indiana Supreme Court has elaborated on the review of cases in which the juvenile court has placed a child with a person or persons other than a natural parent:

> Despite the differences among Indiana's appellate court decisions confronting child placement disputes between natural parents and other persons, most of the cases generally recognize the important and strong presumption that the child's best interests are ordinarily served by placement in the custody of the natural parent. This presumption does provide a measure of protection for the rights of the natural parent, but, more importantly, it embodies innumerable social, psychological, cultural, and biological considerations that significantly benefit the child and serve the child's best interests. To resolve the dispute in the caselaw regarding the nature and quantum of evidence required to overcome this presumption, we hold that, before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant

advantage to the child.  The presumption will not be overcome merely because "a third party could provide the better things in life for the child." *Hendrickson [v. Binkley]*, 161 Ind. App. [388,] 396, 316 N.E.2d [376,] 381 [(1974)].  In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria.  The issue is not merely the "fault" of the natural parent.  Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person.  This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review.  A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required.  [*In re Marriage of*] *Huber,* 723 N.E.2d [973,] 976 [(Ind. Ct. App. 2000)].

*In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002), *reh'g denied*.

# Whether Juvenile Court Abused its Discretion in Granting Grandparents' Petition for Guardianship of A.M.

[13]    Mother first contends that we must assume that the juvenile court applied the wrong legal standard when evaluating Grandparents' petition because it did not explicitly state that it was finding by clear and convincing evidence that placement with Grandparents was in A.M.'s best interests.  Mother, however, does not point to an Indiana statute or case holding that such a statement must

be made, and our research has uncovered none. In the absence of any binding authority, we decline to impose a new requirement on the court in guardianship cases.

[14] Mother also argues that, even if the juvenile court applied the correct standard, its findings do not support a conclusion, by clear and convincing evidence, that granting Grandparents guardianship over A.M. is in his best interests. We disagree. The juvenile court's detailed findings, none of which Mother contests, do not paint a flattering picture of Mother. In contrast to Grandparents' clearly-established financial and domestic stability, the record indicates that Mother has a history of unstable housing and employment, has had multiple contacts with the criminal justice system in Indiana and Missouri, has made at least some poor relationship choices, and engages in inappropriate behavior. Mother admitted that since moving to St. Louis she had had four residences, none of which matched the address on her open arrest warrant. As of the final hearing, Mother's employment situation was uncertain, as her part-time job seemed to be in danger of ending and she had not been paid for approximately two months. Mother has been arrested three times and had one criminal case pending at the time of the final hearing. Mother's violent, armed confrontation with her boyfriend, which was witnessed by A.M., was the event that triggered A.M.'s latest move to Grandparents' residence.

[15] Also troubling is Mother's demonstrated history of indifference toward A.M. A.M. has been with Grandparents for all of his birthdays and all of his Christmases. After A.M. moved in with Grandparents in August of 2013, with

the exception of a few text messages, Mother made no attempt to contact or visit A.M. before the initial hearing on June 27, 2014, and, when given the opportunity to visit with A.M. after the initial hearing, left after approximately five minutes to take a telephone call from an unknown third party and did not resume visitation. Mother then had no further contact with A.M. until August 1, 2014.

[16]    The record also places Mother's honesty and integrity into serious doubt. Despite A.M. not living with Mother after August of 2013, Mother claimed him as a dependent on her 2013 tax return and, in May of 2014, applied for governmental benefits in Missouri, claiming A.M. as a resident in her home. Mother initially claimed not to recall two of her three arrests, despite the conduct leading to the last arrest occurring on June 15, 2014, less than two months before the final hearing. Mother also denied, rather implausibly, that she had anything to do with pictures posted on the internet of her engaged in apparent illegal drug use, among other things. Mother blamed the posts on hacking and a stolen cellular telephone. In summary, there is substantial evidence to support a conclusion that Mother is currently unable or unwilling to provide an appropriate environment in which to raise A.M.

[17]    In contrast, the juvenile court heard substantial evidence regarding Grandparents' fitness and A.M.'s attachment to them. Grandfather has been employed in the same place for approximately twenty-nine years, Grandmother is a recently-retired long-term employee of Michigan City Schools, and Grandparents have been married for twenty-five years and in the same home

for twenty-three years. Grandparents have adequate space for A.M. and have enrolled him in a private school. A.M. also exhibits a close bond with Grandparents. When Mother finally did exercise visitation with A.M. on August 1, 2014, A.M. had to be physically forced into the car in which Mother came to retrieve him while he was screaming, kicking, crying hysterically, and saying "I don't want to go, I don't want to do." Tr. p. 45. In light of the evidence of Mother's instability, indifference, and dishonesty and evidence of Grandparents fitness, we conclude that the record is more than sufficient to sustain a finding, by clear and convincing evidence, that A.M.'s best interests are substantially and significantly served by placement with Grandparents.

[18] The judgment of the juvenile court is affirmed.

[19] Vaidik, C.J., and Kirsch, J., concur.